905 P.2d 1047

Brent E. WOODFIELD, M.D., Appellant–Respondent on Appeal,

v.

BOARD OF PROFESSIONAL DISCIPLINE OF the IDAHO STATE BOARD OF MEDICINE, Respondent–Appellant on Appeal.

Docket No. 21368.

Court of Appeals of Idaho.

Nov. 1, 1995.

Uranga, Uranga & Beiter, Boise, for appellant on appeal. Jean R. Uranga argued.

Hawley, Troxell, Ennis & Hawley, Boise, for respondent on appeal. Joseph D. McCollum, Jr., argued.

SWANSTROM, Judge Pro Tem.

The Board of Professional Discipline (the Board) of the State Board of Medicine issued an order revoking Dr. Brent E. Woodfield's license to practice medicine in the State of Idaho. Dr. Woodfield sought judicial review of the Board's action in the district court. The district court reviewed the record of the Board's action and vacated the Board's revocation order. The district court remanded the matter to the Board for further findings and conclusions and to accord Dr. Woodfield his due process right to provide testimony on the issue of his credibility. The Board now appeals from the district court's decision. We affirm the order of the district court in part, reverse in part, and remand.

## I.

### FACTS

Dr. Woodfield had been a practicing obstetrician/gynecologist in Ontario, Oregon, before moving to Rexburg, Idaho, in November 1991. He resumed his ob/gyn practice and applied for staff privileges at the Madison Memorial Hospital in Rexburg. Because Dr. Woodfield had not practiced his specialty during the previous year and a half, the hospital arranged for a proctoring program by which two resident ob/gyns, Drs. Lovell and Crouch, would observe Dr. Woodfield's surgeries and report any deficiencies in his skills and technique which might place patients at risk in the hospital.

In March 1992, a former patient of Dr. Woodfield voiced a complaint about Dr. Woodfield which was reported to the Idaho State Board of Medicine. An investigation was conducted, resulting in commencement of disciplinary proceedings before the Board of Professional Discipline under the Idaho Medical Practice Act, I.C. §§ 54–1801 to –1819. A twelve count "complaint" filed with the Board by its Executive Director against Dr. Woodfield alleged incidents of breach of the standard of care with regard to his care and treatment of twelve patients, and of unethical conduct involving sexual improprieties with one of those patients treated by Dr. Woodfield between November 1991 and July 1992. Summarized briefly, the alleged offending conduct included failure to conduct pre-operative workups and tests, inadequate and incorrect record keeping, inadequate surgical skills causing risk and unnecessary trauma to patients, performing unnecessary surgery and engaging in unethical conduct involving sexual improprieties with a patient. Dr. Woodfield denied these allegations and sought a hearing by the Board.

The Board appointed a hearing officer to take testimony and to make recommended findings and conclusions. At issue was whether Dr. Woodfield had violated I.C. § 54–1814(7) or I.C. § 54–1814(22) in his professional conduct toward these twelve patients as alleged in the complaint. The relevant parts of the Medical Practice Act are as follows:

**54–1814. Grounds for medical discipline:** Every person licensed to practice medicine ... in this state is subject to discipline by the board ... upon any of the following grounds:

. . . . .

(7) The provision of health care which fails to meet the standard of health care provided by other qualified physicians in the same community or similar communities, taking into account his training, experience and the degree of expertise to which he holds himself out to the public.

. . . . .

(22) Engaging in any conduct which constitutes an abuse or exploitation of a patient arising out of the trust and confidence placed in the physician by the patient.

A hearing was held, and on June 11, 1993, the hearing officer issued findings that Dr.

Woodfield "[had] failed in several instances to meet applicable standard of care requisites in both skill and judgment" and that he "[had] also acted unethically in participating in sexual conduct with a currently treated patient." The hearing officer specifically found that the Board had sustained its burden of proof only as to the counts relating to patients 1, 9, and 10. During the hearing, the Board withdrew the allegations as to patient 3. Along with his findings, the hearing officer concluded that sanctions should be imposed, but did not recommend revocation of Dr. Woodfield's medical license.

The hearing officer also expressed concern that the allegations and the proof against Dr. Woodfield originated from information obtained during the proctoring program, whose objectives were, at best, vague and imprecise.

Following receipt of the recommended findings and conclusions of the hearing officer, the Board conducted an independent review of the record. The Board agreed with the hearing officer's findings that Dr. Woodfield had violated I.C. § 54–1814(7) in his treatment of patients 1 and 9 and violated I.C. § 54–1814(22) with regard to patient 10. However, departing significantly from the hearing officer's findings and concluding that the hearing officer had misunderstood the purposes of the proctoring program the Board also found statutory violations in Dr. Woodfield's treatment of patients 2, 4, 6, 7, 8, and 12. On July 16, 1993, the Board issued an order revoking Dr. Woodfield's license to practice medicine. Dr. Woodfield then sought judicial review of the Board's decision by the district court. I.C. § 54–1806A(12).

The district court's review proceeded under the Idaho Administrative Procedures Act (APA)[1]. In a memorandum decision, the district court concluded that the Board's findings with respect to patients 1, 9, and 10 were supported by substantial evidence, and the district court affirmed the Board's conclusion that Dr. Woodfield had breached the standard of care.[2] As to the remaining pa-

tients, the district court concluded that the Board had departed from and had disregarded the hearing officer's findings without stating its new findings and conclusions with the same specificity and relation to the evidence in the record as was required of the hearing officer. The district court also concluded that the Board erred in finding that the hearing officer had misunderstood the purposes of the proctoring program, which had furnished some of the information that was critical of Dr. Woodfield's skills and abilities.

The district court remanded those counts regarding patients 2, 4, 6, 7, 8, and 12 to the Board for a reexamination of the record, the preparation of additional findings and conclusions, and reconsideration of sanctions. The district court directed the Board to support its conclusions, on remand, with supplemental findings on the question of Dr. Woodfield's credibility. The district court also directed the Board, if it decides to pursue that issue further, to reopen the hearing to develop the record on the issue of Dr. Woodfield's credibility arising from any purported false statements he made about his experience with using video laparoscopy equipment during his practice at Ontario, Oregon. The court reasoned that such a hearing was necessary in order to accord Dr. Woodfield his due process right to provide evidence bearing on his credibility. The district court did not affirm the revocation of Dr. Woodfield's license pending the further action to be taken by the Board on remand. The Board then brought this appeal from the district court's memorandum decision and order.

## II.

## ISSUES

The Board raises several issues in this appeal. The Board asserts that the district court erred: (1) in ruling inadmissible the rebuttal testimony of Dr. John Sigurdson, which addressed Dr. Woodfield's credibility about his experience with the laparoscope;

1. Idaho Code §§ 67–5201 to –5292 (1989 and Supp.1994).

2. In its memorandum decision, on page 29, par. 1, the district court inadvertently refers to "counts two and nine," but obviously intended to

refer to counts one and nine. As to count ten, the district court did not discuss that the Board had found a violation of I.C. § 54–1814(7) as well as a violation of I.C. § 54–1814(22).

(2) in requiring the Board to make separate findings and conclusions when it departed from those of the hearing officer; (3) in concluding that the Board erred in finding that the hearing officer did not understand the proctoring program and that the Board's finding to that effect did not comport with the evidence; and (4) in ruling that the Board failed to articulate the applicable standards of care that a physician practicing obstetrics and gynecology in Rexburg, Idaho, should be held to.

## III.

## STANDARD OF REVIEW

 In a subsequent appeal from the district court's decision where the district court was acting in its appellate capacity in a review under the APA, the Court of Appeals reviews the agency record independently of the district court's decision. *First Interstate Bank of Idaho, N.A. v. West,* 107 Idaho 851, 693 P.2d 1053 (1984); *Salinas v. Canyon County,* 117 Idaho 218, 786 P.2d 611 (Ct.App. 1990); *Madsen v. State, Dep't. of Health & Welfare,* 114 Idaho 182, n. 3, 755 P.2d 479, n. 3 (Ct.App.1988). We will defer to the agency's findings of fact unless those findings are clearly erroneous. *Salinas,* 117 Idaho at 221, 786 P.2d at 614. As to the weight of the evidence, neither the district court nor this Court on appeal may substitute its judgment for that of the agency. *Id.;* I.C. § 67–5215(g). Under these guidelines, we review the final decision of the Board upon the record of its proceedings.

## IV.

## ANALYSIS

### A. Testimony of Dr. Sigurdson on the Credibility Issue

 In some of the counts alleging that Dr. Woodfield delivered substandard medical care, his seeming inability to perform routine procedures through a laparoscope, particularly a video equipped laparoscope, and his preference for handling these procedures by way of a laparotomy, were at issue.

At the hearing, Dr. Woodfield testified that he had learned to use a laparoscope during his residency and had performed dissection with the scope by direct visualization through the lens of the instrument. He denied having been trained in the use of a video camera or in the double puncture approach, although he admitted having used a video camera attachment for visualization during a laparoscopic procedure while he was employed in Ontario, Oregon. He testified that he had always used a single puncture approach and that his experience with laparoscopic procedures was limited to lysing adhesions, visualizing the pelvis, taking biopsies in the pelvis and performing tubal ligations. In response to specific questions relevant to the allegations at issue, Dr. Woodfield testified that he had never extracted an ovarian cyst or dealt with an ectopic pregnancy through a laparoscope. Rather, Dr. Woodfield stated that he always had done these procedures by operating through a surgical opening made into the abdominal cavity, known as a laparotomy.

The Board called Dr. Sigurdson to contradict Dr. Woodfield's representations of his lack of familiarity and lack of experience with the laparoscope and video camera equipment. Dr. Sigurdson's testimony, however, was not based on his personal knowledge about Dr. Woodfield's experience with laparoscopy but was derived from Dr. Sigurdson's review of hospital logs kept at Holy Rosary Hospital in Ontario, Oregon, indicating each occasion when Dr. Woodfield had checked out the laparoscopic equipment at the hospital.

In reaching its conclusions, the Board made a credibility determination that Dr. Woodfield had lied in his hearing testimony about his level of experience with the laparoscope. That finding, according to the district court, was not supported by substantial evidence. The district court also held that the Board's finding unfairly injected into the proceedings the question of whether Dr. Woodfield had misrepresented his experience with the laparoscope to the doctors who were proctoring his surgical skills, an allegation which had not been charged in the complaint and against which Dr. Woodfield had not defended.

The Board argues that the district court erred in ruling inadmissible the testimony of Dr. Sigurdson, which the district court concluded was hearsay, speculation and lacking in foundation. The Board contends that it was proper to consider Dr. Sigurdson's testimony because Dr. Sigurdson relied on his review of surgical log books maintained by the hospital which, as business records, are admissible under I.R.E. 803(6) hearsay exception. The Board notes that Dr. Sigurdson's testimony was introduced for the purpose of impeaching Dr. Woodfield's credibility regarding representations about his prior experience with the laparoscope and, therefore, was proper rebuttal evidence.

■ Because the surgical logs from the hospital were records kept in the regular course of business, we conclude that the surgical logs would have been admissible under I.R.E. 803(6). The logs for the years that Dr. Woodfield practiced in Ontario, however, were not entered into evidence. Dr. Sigurdson testified that he had not assisted in any of the procedures recorded in the logs, but it was his opinion upon a review of the logs that, of the fifty-six laparoscopic procedures reportedly done by Dr. Woodfield, all of them would most likely have been done with video equipment.

We agree with the district court that there was no foundation established for Dr. Sigurdson's conclusions about the procedures Dr. Woodfield actually had performed and what he may or may not have done with the particular equipment he had checked out as recorded in the logs. We conclude, as did the district court, that Dr. Sigurdson's testimony, which was offered to prove the truth of his conclusions, was speculative and excludable as hearsay. I.R.E. 801, 802. We affirm the district court's ruling rejecting Dr. Sigurdson's testimony.

With Dr. Sigurdson's testimony excluded, we hold that there exists no other evidence in the record to contradict Dr. Woodfield's testimony regarding his experience with laparoscopic procedures. Dr. Woodfield's testimony in that regard remains uncontradicted by any substantial, competent evidence and thus cannot underlie any of the Board's conclusions. From a reading of the complaint in these disciplinary proceedings, we are reminded that the question for resolution by the Board was not whether Dr. Woodfield had misrepresented his experience with the laparoscope but whether his lack of skill with laparoscopic procedures fell below the standard of care. *See Dep't. of Health and Welfare v. Sandoval,* 113 Idaho 186, 190 n. 7, 742 P.2d 992, 996 n. 7 (Ct.App.1987). We reserve our discussion of the standard of care until later in this opinion.

We agree with the district court that it was error for the Board to enter a finding based upon Dr. Sigurdson's testimony that Dr. Woodfield's testimony was not to be believed, which finding contributed to the Board's ultimate decision to revoke Dr. Woodfield's license. However, for guidance to the Board on remand, we later discuss the treatment of certain patients where our decision may differ with the decision of the district court.

■ At the hearing, the Board had the burden under I.C. § 54–1814(7) to show, among other things, what Dr. Woodfield's training and experience had been, as these factors help determine the standard of care he is expected to meet. In carrying this burden, the Board might rely upon the testimony of Dr. Woodfield himself as to what his experience with video laparoscopy had been. But if the Board believed that the witness did not truthfully or accurately present the extent of his experience, then the Board was entitled to present other more credible evidence showing that the doctor had had more experience with video laparoscopy than he was willing to admit. Depending upon proper evidence and circumstances, the Board could even find that the witness had lied about his experience. That would not necessarily be unfair, nor would it be injecting any new "unpleaded" issues into the case. Finding one or two serious credibility lapses may raise legitimate doubt that the other testimony from the same source is similarly flawed.

However, the evidence itself had flaws here and must be rejected; it cannot be the basis for any finding. On remand, either party should be allowed an opportunity to introduce additional evidence concerning Dr.

Woodfield's experience with video laparoscopy.

Only some of the cases presented a significant credibility issue. As to patient 10, the hearing officer entered findings on the credibility of the witnesses who testified about Dr. Woodfield's sexually inappropriate and unethical conduct. The hearing officer and the Board found an ethical violation; the Board found a standard of care violation as well. Similarly, the treatment of patient 12 raised a credibility issue, where the patient's testimony about the duration of the ultrasound, which she alleged was conducted for a sexual purpose, conflicted with Dr. Woodfield's recollection of the ultrasound. There, the hearing officer considered the credibility of the witnesses and determined that Dr. Woodfield's testimony was corroborated by the testimony of his assistant and by the time indications on the ultrasound photographs, which were consistent with Dr. Woodfield's memory of the ultrasound. Rejecting the hearing officer's finding of Dr. Woodfield's credibility, the Board determined that Dr. Woodfield was lying about the length of the ultrasound on patient 12. The Board also found, with respect to patient 7, that Dr. Woodfield provided false testimony about his level of experience with indirect laparoscopy.

Generally speaking, findings based on witness credibility depend critically on observation of the witness. *See* 4 Davis, *Administrative Law Text* § 11.2 at 193. Therefore, "the decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement with the [hearing officer]." *General Dynamics Corp. v. Occupational Safety and Health Review Comm'n,* 599 F.2d 453 (1st Cir.1979).

We are mindful, however, that an agency which is statutorily designated to be the ultimate fact-finder need not accept the hearing officer's factual determinations on every case where credibility of witnesses is a factor. *See, e.g., Dep't. of Health and Wel-*

*fare v. Sandoval,* 113 Idaho 186, 190, 742 P.2d 992, 996 (Ct.App.1987).

We also conclude—as did the district court—that the Board's finding, that Dr. Woodfield was lying with regard to the length of the ultrasound, was not supported by substantial evidence. I.C. § 67–5279(3)(d). We uphold and adopt the district court's ruling overturning the Board's conclusion that Dr. Woodfield breached the standard of care by conducting an excessively long vaginal ultrasound on patient 12.

**B. Requirement of New Findings by the Board**

The Board next claims that the district court erred in requiring the Board to articulate a basis for its departure from the decision of the hearing officer. The Board asserts that all that is required is that its decision be supported by the evidence in the record when it departs from the findings and recommendation of the hearing officer.

The Board of Discipline, which is an agency governed by the APA has a duty to supplement its decision with findings of fact and conclusions of law. I.C. § 54–1806A(6)(e). An agency's order must contain a reasoned statement in support of the decision, including a concise and explicit statement of the underlying facts of record supporting the findings. I.C. § 67–5248. Findings of fact must be based exclusively on the evidence in the record and on matters officially noticed in that proceeding. *Id.*

When the Board's findings disagree with those of the officer issuing the recommended order, the question for the reviewing court remains whether the Board's findings are supported by substantial evidence. *N.L.R.B. v. Warren L. Rose Castings, Inc.,* 587 F.2d 1005 (9th Cir.1978). Although the district court is not required to take into account the hearing officer's findings, this Court "will scrutinize the Board's findings of fact more critically if they contradict the [hearing officer's] conclusions than if they accord with the [hearing officer's] findings." *Loomis Courier Service, Inc., v. N.L.R.B.,* 595 F.2d 491, 496 (9th Cir.1979).[3]

**3.** There is authority for courts to use findings in administrative law judge (ALJ) reports as the basis for imposing on the agency an obligation of reasoned decision making that includes a duty to

■ Accordingly, we determine that it is consistent with the Board's statutory obligation to render a reasoned decision to require the Board to identify facts, as well as inferences drawn from the facts upon the application of its expertise and judgment, which underlie its decision. Such an explanation is essential to meaningful judicial review, and it is a logical adjunct to the agency's statutory duty to supplement its decisions with findings of fact and conclusions of law. *Dep't. of Health and Welfare v. Sandoval*, 113 Idaho 186, 190, 742 P.2d 992, 996 (Ct.App.1987). We affirm the remand order of the district court directing the Board to delineate its own findings as the basis for its contrary conclusion to that of the hearing officer.

## C. The Proctoring Program

The Board asserts that the district court erred in overturning its finding that the hearing officer had misunderstood the purposes of the proctoring program which the hospital activated when Dr. Woodfield applied for admission to the staff. The district court held that this finding by the Board was not supported by the evidence.

■ Before extending full staff privileges, the hospital wanted to assess Dr. Woodfield's competence and skill in surgery because he was new to the area, he had not practiced medicine for eighteen months and his skills were not known by the administration and staff. The evidence clearly shows that the original objective of the program was to have the proctors merely observe Dr. Woodfield and report to the hospital about any perceived deficiencies that could endanger patients or be of concern to the hospital. Just as clearly, the evidence showed that occasionally the proctors had intervened and assisted Dr. Woodfield with surgical procedures, such that the role of the proctors changed in practice from one of observation to one of mentoring and active participation. In this respect, the proctoring program that was carried out differed from the program that was originally intended. Upon our review of the evidence, we conclude that the hearing officer and the district court were correct in stating how the proctoring program worked in practice. The hearing officer was concerned that there was some degree of unfairness in the process, especially where Dr. Woodfield had not practiced his skills for a year and a half and the proctoring doctors acted at times as mentors, showing Dr. Woodfield how certain video-laparoscopy procedures could be accomplished, for example. Apparently the hearing officer and the district court were also concerned that, while Dr. Woodfield might have understood that the program could lead to the hospital's decision to curtail his surgical privileges there, he was not made aware that the proctors' reports might be used by the Board to revoke his license to practice medicine because his surgical skills were "rusty" or inadequate.

In fairness to the Board, the evidence suggests that the proctors intervened or assisted Dr. Woodfield in some cases in order to deter him from going ahead with a more invasive procedure, *e.g.*, a laparotomy, when the procedure could be accomplished with the laparoscope, resulting in less trauma to the patient. The evidence could support a finding that in at least two instances, but for the intervention of other doctors, Dr. Woodfield would have proceeded with unnecessary surgery, riskier procedures or more invasive treatment of the illness.

explain why the agency differed with the ALJ. 4 Davis, *Administrative Law Text* § 11.2 at 184, citing *Alabama Assn. of Ins. Agents v. Board of Governors of the Federal Reserve System*, 533 F.2d 224, 247 (5th Cir.1976), cert. denied, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (Board's findings will be vulnerable where Board merely announces opposite conclusion from the ALJ without explanation); *ITT Continental Baking Co. v. F.T.C.*, 532 F.2d 207, 219 (2d Cir.1976) (when an agency departs from the ALJ's findings, "it must explain why"); *International Brotherhood of Teamsters v. N.L.R.B.*, 587 F.2d 1176, 1181 (D.C.Cir.1978) ("the Board must not 'merely [state] that it disagrees,' but must set forth the basis of [its] disagreement"); *Local No. 441, International Brotherhood of Electrical Workers, AFL–CIO v. N.L.R.B.*, 510 F.2d 1274, 1276 (D.C.Cir.1975) (it was "incumbent on the Board to first identify expressly an awareness that it was disagreeing with the ALJ ... and second, to set forth the basis of disagreement with the ALJ."); *Teamsters Local Union 769 v. N.L.R.B.*, 532 F.2d 1385, 1392 (D.C.Cir.1976) (Board should articulate its reasons for reversing the ALJ).

Within three months of the start of the proctoring process, the credentials committee of the hospital furnished Dr. Woodfield with a summary of the proctoring reports and met with him to discuss the committee's recommendations. By February 7, 1992, Dr. Woodfield was on notice that the committee thought there were deficiencies which should be addressed through a six-month "refresher course." Dr. Woodfield rejected this recommendation, and the hospital continued to proctor his surgeries.

■■■ In conclusion, we are not persuaded that use of the proctor's reports as the basis for allegations in the Board's complaint violated any due process right to a fair hearing. Clearly, the hearing officer did understand the intent of the proctoring program. As the district court noted, the Board may not simply disregard the findings of the hearing officer merely by saying that he did not understand. The Board may, however, make its own determinations of credibility of witnesses and of weight to be given to the evidence derived from the proctoring program and then make its own findings based upon evidence properly in the record.

The fact that the proctors occasionally gave advice and instruction, acting as mentors, and at times intervened to change Dr. Woodfield's course of action, make it more difficult for the fact finder to determine whether the health care provided by Dr. Woodfield in those instances failed "to meet the standard of health care provided by other qualified physicians in the same community," but the proctors' participation does not prevent the Board from doing so.

### D. The Board's Failure to Articulate Applicable Standards of Care

As its final issue on appeal, the Board disputes the district court's ruling that the Board failed to articulate the applicable standards of care, thereby precluding review by the court and impairing Dr. Woodfield's due process rights. The Board argues that, as the trier of fact, it was entitled to resolve any conflict in the testimony of the expert witnesses and to make findings supported by substantial evidence. The Board also contends that the standard of care to which Dr.

Woodfield was held was established by expert testimony at the hearing and that both the standard of care and the conduct alleged to have been below the standard were clearly identified in its order.

■■■ In Idaho, a physician is subject to medical discipline for the provision of health care which fails to meet the standard of health care provided by other qualified physicians in the same community or similar communities, taking into account his training, experience. and the degree of expertise to which he holds himself out to the public. I.C. § 54–1814(7). The language of I.C. § 54–1814(7) has been held to be similar to the well-accepted definition of medical malpractice, contained in I.C. § 6–1012, and sufficient to notify medical practitioners that they could be disciplined for failure to conform to the community standards. *Krueger v. Board of Professional Discipline*, 122 Idaho 577, 836 P.2d 523 (1992). Therefore, a determination of a violation of the standard of care must be supported by expert testimony establishing the community's generally accepted standard of care required of the physician under the circumstances of each case under scrutiny. *Id.* In addition, the determination may involve evaluation of the evidence by the Board, using the personal, specialized knowledge, technical competence and experience of the Board, which was comprised of members of the medical community. *Id.* at 581, 836 P.2d at 527. *See also* I.C. § 67–5210(4). Without clearly articulated standards as a backdrop against which the court can review discipline, the judicial function is reduced to serving as a rubber-stamp for the Board's action. *H & V Engineering, Inc. v. Idaho State Board of Professional Engineers and Land Surveyors*, 113 Idaho 646, 650, 747 P.2d 55, 59 (1987).

■■■ *Patient 1.* As to patient 1, the findings of the hearing officer which were adopted by the Board, are supported by the evidence and these findings support the "ultimate" finding that Dr. Woodfield failed to meet the standard of care in treating this patient. Notably, Dr. Woodfield undertook an "invasive surgical approach" which was not warranted under the "presenting circum-

stances." The hearing officer and the Board made separate findings showing that Dr. Woodfield's own office records did not support his diagnosis and his testimony. The Board, particularly, focused on these discrepancies to conclude that Dr. Woodfield was not honest and had attempted to improperly justify the surgery when his own charts belied his version of the facts. The Board also concluded that "his failure to do an appropriate workup demonstrates a lack of understanding of the basic principles of the practice of medicine." The composite findings of the Board on this count are supported by substantial competent evidence. While the fact-finding process involved a question of Dr. Woodfield's credibility, that question was resolved by the fact finders on the basis of the doctor's own records, and we are shown no reason to disturb any of the Board's findings in this case.

 *Patient 2.* At the disciplinary hearing, Dr. Crouch testified that he watched Dr. Woodfield begin a laparoscopy on this patient. He observed Dr. Woodfield's initial insertion of the knife into the patient and determined that the knife was inserted "too deeply." He testified as to how he generally makes a skin incision, keeping the blade of the knife more parallel to the skin's surface and not using the full thickness of the blade. According to Dr. Crouch, inserting the knife perpendicular to the skin, as Dr. Woodfield did, threatened the internal structures underlying the area of the incision. It was Dr. Crouch's opinion, in the case of this thin patient, that Dr. Woodfield's approach put the patient at risk.

Dr. Kindred, another of the Board's expert witnesses, concurred with Dr. Crouch that a knife inserted too deeply would be a violation of the standard of care, but he had not been a witness to the procedure. Dr. Kindred also noted, from his review of the patient's records, that no damage to the underlying structures was caused by Dr. Woodfield's methods. The hearing officer believed the evidence was not sufficient to support a conclusion that Dr. Woodfield's knife insertion technique did not meet the standard of care.

Relying on Dr. Crouch's expert testimony, the Board found that Dr. Woodfield had violated the standard of care by inserting the knife too deeply when perforating the patient's skin prior to the insertion of the instruments for laparoscopic procedures. Within the Board's conclusion, however, we can find no measure for comparing the alleged inadequacy of Dr. Woodfield's technique in inserting the knife with a standard derived either from expert testimony proffered at the hearing or a well-recognized standard, articulated by the Board, based on the expertise and experience of the member physicians. *See Krueger, supra.* While it appears that the Board accepted the standard of care articulated by Dr. Crouch, requiring that the doctor insert the knife so as not to put the patient at risk, we find the Board's application of the standard to Dr. Woodfield's conduct unreviewable without qualitative information regarding an appropriate angle and depth for inserting the knife blade to maintain an acceptable distance from substructures as they presented in this patient with very little body fat.

 As well as finding Dr. Woodfield's surgical technique inept, the Board concluded that Dr. Woodfield exhibited an inadequate degree of skill in conducting laparoscopic procedures and fell below the community standard of care. Supporting that conclusion, the Board cited Dr. Woodfield's confusion in recognizing normal anatomical structures during the course of the diagnostic laparoscopy on this patient.

Dr. Crouch testified that he had been recalled into surgery when Dr. Woodfield was unable to identify a "bony mass" which he determined should be biopsied by means of a laparotomy. Dr. Crouch testified that he recognized and identified the bony mass as the "sacral promontory," dispelling any need for a biopsy, but that Dr. Woodfield remained unpersuaded. Dr. Crouch also testified that the sacral promontory is generally obscured by the bowel and that Dr. Woodfield may not previously have seen one so obvious as the one in this thin patient. Dr. Cook, the attending anesthesiologist, confirmed that Dr. Woodfield continued to doubt the identification of the bony mass. After consulting with another doctor, Dr. Gerrie, Dr. Woodfield scheduled a CT scan to con-

duct further tests instead of proceeding with a laparotomy.

The testimony of Drs. Kindred and McGowan, two other experts, set forth that it would have been a care violation for Dr. Woodfield to have performed a laparotomy based upon his misidentification of the sacral promontory. They testified that Dr. Woodfield's decision to seek additional opinions about the bony mass and to forego the laparotomy based on those opinions was appropriate and within required norms of practice. The Board found, however, that "Dr. Woodfield's confusion regarding recognition of the sacral promontory represents an inability to recognize normal anatomic structures." We think that there was sufficient, although conflicting, evidence in the record to support this finding. Such a finding is one which falls well within the expertise possessed by the Board. From the testimony of various doctors who testified about this incident, the Board could infer that under the circumstances presented a proper identification should have been made. We uphold this particular finding of the Board and the Board's conclusion that this failure violated the standard of care.

*Patient 3.* At the hearing, the Board withdrew the this count of the complaint.

*Patient 4.* On January 10, 1992, Dr. Woodfield performed surgery upon a woman who had delivered a baby earlier in the day and who was experiencing post-partum hemorrhaging. The woman's doctor had been unable to stop the blood loss, he had to leave the hospital and he arranged for Dr. Woodfield to take over the case. Later that day, Dr. Woodfield performed a hysterectomy, with Dr. Lovell assisting.

Although the surgery was successful, the Board concluded that the care Dr. Woodfield provided failed to meet the community standard of care. The Board found that he had failed to insure that adequate blood products were available or ordered prior to surgery, that he had failed to fully discuss the surgical options with the patient and establish her goals regarding future child bearing, that he did not demonstrate a basic knowledge or understanding of coagulation studies, or an awareness of the patient's blood status and

the need for blood products, and that he misstated the amount of blood loss suffered by the patient.

The hearing officer made extensive findings of fact from which he concluded that no standard of care violation had been shown. The hearing officer's findings were adopted by the Board without any stated exceptions; however, the Board added a few findings of its own and concluded that the care provided was deficient, as stated above.

In its review of the Board's action, the district court also carefully considered the evidence in this case and concluded that it was not sufficient to support the Board's conclusion there had been a breach of the standard of care. Generally, we believe the district court's analysis of the evidence in this case is correct and we adopt it except as to the following matters.

Before he left the hospital, the patient's doctor ordered four units of blood to be available for transfusion, if necessary. At least one of these units was transfused before the patient was taken to surgery by Dr. Woodfield. The remaining units were not adequate to sustain the patient through the surgery. Dr. Woodfield did not order any additional blood products before surgery, nor did any member of his team. Although not ordered previously, adequate blood products were available during surgery because the anesthesiologist, Dr. Cook, ordered additional blood products during the surgery.

The hearing officer stated:

I am uneasy, due to the lack of testimony, whether [Dr. Woodfield] felt the previously ordered blood to be adequate. If he felt the ... blood order to be adequate, [Dr. Woodfield] would have failed to meet the standard of care required under the circumstances.

Without making pertinent findings, the Board's conclusion went one step further.

Apparently, the Board believed that it made no difference whether Dr. Woodfield thought the previously ordered blood would be sufficient for the surgery, because if he did he simply failed in his assessment of the situation, as the hearing officer suggested

above. On the other hand, if Dr. Woodfield felt the previously ordered blood would not be adequate, he should have immediately ordered additional blood products before proceeding with the hysterectomy. This he did not do. These findings could be made from the medical records that were furnished to the Board and from the evidence given by the experts who testified from personal knowledge about the circumstances presented in this case. Giving deference to the collective expertise possessed by the Board and recognizing its role as the ultimate fact finder in these cases, we are unwilling to overturn the Board's findings that "Dr. Woodfield did not demonstrate . . . an awareness of the patient's blood status and the need for blood products," [at the time he proceeded with the surgery]. Likewise, we hold that the evidence supports the Board's finding that "Dr. Woodfield misstated the amount of blood loss," apparently referring to Dr. Woodfield's written summary report of the surgery.

As to the weight of the evidence on such questions of fact, this Court will not substitute its judgment for that of the agency. I.C. § 67–5279. However, we cannot find as a matter of law that these actions violated the standard of care unless we speculate that the Board relied on its expertise and its knowledge of the standard of care. This we will not do. On remand, the Board may consider whether, based on the limited findings we have upheld, there has been a failure to meet the community standard of care.

*Patient 5.* As to patient 5, the Board found no violation of the community standard in the health care provided by Dr. Woodfield.

 *Patient 6.* In this case, the patient had complained of recurring abdominal pain and a history of abnormal bleeding. Dr. Woodfield's examination revealed acute bleeding in the uterus related to the presence of a "necrotic mass" protruding from the cervix into the vaginal canal. Dr. Woodfield did not do a biopsy in the office or at the start of the surgery for the hysterectomy. Although Dr. Lovell testified that Dr. Woodfield became convinced that he was dealing with a fibroid tumor, not a necrotic mass, Dr. Lovell testified that most doctors would have done a pre-operative sampling of the mass or the endometrial cavity to rule out a malignant tumor.

The Board found that Dr. Woodfield had mishandled this patient's treatment by performing a hysterectomy without first attempting to biopsy what he had originally diagnosed as a necrotic mass and by relying too heavily on an ultrasound to identify the mass. The Board found that Dr. Woodfield's surgical technique was poor and that during surgery he was unable to decisively consider and select a course of procedure. Finally, the Board found that Dr. Woodfield lacked an understanding of antibiotic therapy, evident in his choice of drugs to be administered post-operatively to this patient. The Board concluded that Dr. Woodfield's handling of this patient's case constituted a breach of the standard of care.

From the record, we can infer that the standard applied by the Board was based on a consensus of the experts' opinions that a PAP smear test and a cervical biopsy would have been appropriate steps in the pre-operative workup to reach a correct diagnosis and to define a proper course of treatment. The Board's decision, however, disregards Dr. Woodfield's testimony indicating that the bleeding in the uterus would have worsened as a result of the procedure to biopsy the endometrium, which could have endangered the patient. Neither does the Board's decision appear to take into account the testimony of Drs. McGowan and Kindred that Dr. Woodfield should not be criticized for his failure to do a biopsy where there was acute bleeding in the uterus.

The Board, however, made no express finding that the generally accepted standard of care mandated a pre-operative biopsy where either a necrotic mass or a fibroid tumor was present. Indeed, the evidence in the record supports a finding that the patient's acute bleeding precluded a biopsy and rendered a biopsy futile. We therefore reverse the Board's conclusion in this regard.

 As to Dr. Woodfield's improper choice of antibiotics post-surgery and his poor surgical technique, the Board's ultimate finding of breach must necessarily be based

upon the uncontroverted testimony of Dr. Lovell addressing the standard of care. Dr. Lovell asserted that the modern antibiotics Dr. Woodfield used "aren't necessarily the best antibiotics, though they are adequate. They are not the standard antibiotics that are usually used for prophylaxis or for treating most pelvic infections."

Dr. Lovell's testimony established that the interfasciable method of performing a hysterectomy is a standard procedure to avoid injury to the ureters. Dr. Woodfield was not accustomed to doing this procedure. However, "upon the prodding of Dr. Lovell, Dr. Woodfield then performed the hysterectomy in the suggested manner albeit 'awkwardly,'" according to the hearing officer's findings. "Dr. Lovell also provided substantial assistance in completing the procedure," and good results were obtained.

The hearing officer noted that the surgery in this case took place on December 7, 1991, approximately three weeks into the proctoring program for Dr. Woodfield. Although the hearing officer found from the evidence that Dr. Woodfield's performance was "awkward and tentative," he was reluctant to recommend that disciplinary action should result, "particularly where the criticism flows from a proctoring process which initially contained elements of teaching."

The Board also stated that Dr. Woodfield's approach was "awkward, indecisive and represented poor surgical technique." Based, apparently, upon all of the deficiencies which the Board had found, the Board concluded that "Dr. Woodfield violated the community standard of care with respect to his handling of this patient."

The Board's finding that Dr. Woodfield's surgical technique in performing this hysterectomy was poor, awkward and indecisive is supported by the evidence. Also, the uncontroverted evidence and the findings establish that he was unprepared to accomplish the surgery by the interfasciable method, "a method clearly of accepted standard practice," until he was guided through the procedure by Dr. Lovell. Dr. Woodfield's intended approach to the surgery would not have met the community standard of care had he not been prodded by Dr. Lovell into doing the standard procedure. The evidence does not suggest that this was a pre-arranged training session for Dr. Woodfield, rather, that he undertook a surgery that he was unprepared to handle in a manner that would meet the community standard of care. Under these circumstances, we uphold the Board's conclusion that there was a breach of the community standard of care.

■ *Patient 7.* This case was one of the earliest handled by Dr. Woodfield at Madison Memorial Hospital on November 25, 1991. The Board found that Dr. Woodfield's inability to use a laparoscope to lyse adhesions fell below the community standard of care. After he had viewed the adhesions through diagnostic laparoscopy, Dr. Woodfield planned to open up the patient in a laparotomy procedure for the purpose of lysing the adhesions, but, with urging and direction from Dr. Lovell, he accomplished the task with video-equipped laparoscope.

Dr. Lovell testified that laparoscopic adhesiolysis was a most common procedure and for Dr. Woodfield not to be proficient in using laparoscopy to lyse adhesions would be a violation of the standard of care. Dr. Kindred also testified that to lyse adhesions through the laparoscope was standard practice. Dr. McGowan, however, testified that it is appropriate in some cases to do adhesiolysis directly with a laparotomy. Dr. McGowan also testified that although she had been trained during her residency in diagnostic laparoscopy, she had not been trained in operative laparoscopy which she has over the years familiarized herself with and practiced with the assistance of doctors more experienced in operative laparoscopy.

As discussed earlier in this opinion, the Board rejected as false Dr. Woodfield's testimony that he had never before broken adhesions with indirect laparoscopy, used an electrocautery probe in an indirect laparoscopy or a double puncture laparoscopic procedure. We can set this finding aside as not necessary to the outcome here given the evidence produced at the hearing.

This case presents another instance where Dr. Woodfield was prepared to proceed with a more invasive and unnecessary laparotomy

when a less traumatic procedure was routinely used by gynecologists with similar training and experience. In this instance, the evidence shows that Dr. Lovell dissuaded Dr. Woodfield from doing a laparotomy and directed and assisted him in lysing the patient's adhesions using the video laparoscope to view the operative area. Disregarding any of the Board's findings concerning the doctor's truthfulness about his prior use of video laparoscopes in performing surgery— as opposed to simple viewing or diagnostic procedures—we can readily uphold the Board's finding that:

> Based upon his prior experience and practice, Dr. Woodfield should not have had any difficulty lysing the adhesions through a laparoscope. His inability to use the laparoscopic approach fell below the community standard of care.

Although this finding contains no discrete statement of the standard, the finding contains an implicit statement that the community standard of care required an ob/gyn with Dr. Woodfield's training, experience and practice to be proficient with the laparoscopic method of lysing adhesions, particularly in a case presented here which gave no indication that a separate laparotomy was required. The Board's conclusion that Dr. Woodfield violated the standard of care is affirmed.

■ *Patient 8.* On December 2, 1991, Dr. Woodfield examined this patient and found that she had bleeding in the uterus, an IUD, and a positive pregnancy test. According to Dr. Woodfield's testimony, he diagnosed a possible missed AB with a left ovarian cyst, based on the results of an ultrasound and a quantitative HCG test used to identify the presence of a gestational sac inside the uterus. Dr. Woodfield testified that the HCG reading was below the level where an intrauterine pregnancy can be detected. He further testified that he released the patient with ectopic pregnancy precautions and directions to come in for a repeat ultrasound and HCG test. Based on the results of the ultrasound performed on December 7, 1991, Dr. Woodfield testified that he then diagnosed an ectopic pregnancy and admitted the patient to the hospital. Because Dr. Woodfield had never seen an evacuation of an ectopic pregnancy through a laparoscope, he allowed Dr. Lovell to do the laparoscopic procedure and took the opportunity to observe.

Dr. Lovell in his testimony was critical of Dr. Woodfield's decision to release the patient if a tubal pregnancy was suspected. Dr. Lovell stated that by sending the patient home with symptoms suggesting an ectopic pregnancy, Dr. Woodfield placed the patient in jeopardy. Dr. Kindred testified that it was not standard practice to send the patient home for a few days if you became aware of an ectopic pregnancy; the standard practice would be to immediately place the patient in the hospital to deal with the ectopic pregnancy. On cross-examination, Dr. Woodfield agreed that the standard of care in Rexburg required removal of an ectopic pregnancy as soon as it was diagnosed, but he maintained that the patient was admitted for surgery on the same day he made the diagnosis of an ectopic pregnancy.

With respect to Dr. Woodfield being unable to handle an ectopic pregnancy laparoscopically, Dr. Lovell testified that he preferred laparoscopy although he recognized that laparotomy was a viable option if the doctor determined that he could not adequately manage with a laparoscope. The Board made no finding that Dr. Woodfield was deficient in not being able to manage the ectopic pregnancy through laparoscopic procedures.

■ Although not alleged in its complaint, the Board in this case found that Dr. Woodfield exercised poor judgment by putting the patient at risk and that sending the patient home under the circumstances constituted grossly substandard care. The pleading relative to this patient's care gave Dr. Woodfield notice only of the Board's allegations regarding his inability to manage this patient's care using a laparoscope.

We find that the deviation between the allegations and the proof denied Dr. Woodfield a fair opportunity to gather witnesses and prepare a defense. *See Krueger,* 122 Idaho at 582, 836 P.2d at 528. We also agree with the district court's holding that the evidence does not support the Board's conclu-

sion of a gross violation of the standard of care. For these reasons, the Board's conclusion must be reversed.

■ *Patient 9.* The Board in the case of this patient made findings that Dr. Woodfield had performed an inadequate workup, had unduly relied upon vaginal ultrasounds, exhibited poor surgical skills and misdiagnosis. As a result, the Board concluded that Dr. Woodfield had failed to the meet the standard of care by performing unnecessary surgery which exposed the patient to avoidable trauma. The Board's findings, which adopt and incorporate all of the hearing officer's findings, are supported by the evidence. The Board's general finding that Dr. Woodfield "exhibited poor surgical skills" is based wholly upon the testimony of Dr. Lovell, who as a proctor had observed the surgery. The hearing officer made no finding regarding the surgical technique in this case.

Based on the patient's pathology and indications reported in Dr. Woodfield's office charts, Dr. Lovell testified that the exploratory laparotomy was not an appropriate course of treatment. Dr. Lovell testified that the patient's cyst was not of an abnormal size and not an uncommon occurrence in a woman's menstrual cycle. Dr. Lovell recounted in his testimony that this patient, within the last year, had had a laparoscopic evaluation which did not reveal a tumor, and that management of her case should have included determined ovarian suppression with birth control pills and observation over a couple of months. Drs. Kindred and McGowan agreed that the standard of practice was to attempt to use the least traumatic approach if there were approaches other than a laparotomy that were possible. Under the circumstances of this case, the three experts agreed that proceeding with the laparotomy was unnecessary and a violation of the standard of care.

Dr. Woodfield testified that this patient continued to have pelvic pain following the earlier laparoscopy and doubted that a second laparoscopy would resolve her problems. Dr. Woodfield testified that she had refused his suggestion of birth control pills to address her condition and that she wanted to take care of the matter quickly, before her wedding, in order that her parents' insurance would cover the cost of the procedure. Apparently, this testimony could not be corroborated by a review of Dr. Woodfield's records, and the Board elected to disregard this testimony.

Pursuant to our review of the record, we conclude that the Board's findings are supported by the evidence. Therefore, we uphold the Board's conclusion that Dr. Woodfield breached the standard of care by performing an unnecessary laparotomy, causing the patient to suffer unnecessary trauma.

■ The Board's complaint also alleged with some detail how Dr. Woodfield "exhibited poor surgical technique." Dr. Lovell's testimony at the hearing supported the allegations, which were presumably based upon his own proctoring report. Yet, as noted previously, neither the hearing officer nor the Board made any factual findings describing the "poor surgical technique" which fell below the community standard of care. We think these basic findings are required and we do not believe that a reviewing court can supply the findings simply by saying that the Board's factual allegations could be supported by the evidence, and, therefore, that the Board very probably found that all of its own allegations were true. Accordingly, without more specific findings by the Board, we will not uphold the Board's ultimate finding that Dr. Woodfield exhibited poor surgical skills which failed to meet the community standard of care and which exacerbated the trauma caused to the patient by the surgery.

■ *Patient 10.* As to this Count, the Board's findings included the following: Dr. Woodfield saw this patient in and out of his office and engaged in sexual improprieties with the patient. The doctor used his professional role to manipulate the patient, knowing that the patient was on tranquilizers and pain pills which he had prescribed and which could impair her judgment. He acted unethically in trying to talk the patient's husband into leaving his wife, using as an excuse his diagnosis that the patient suffered from "attention deficit disorder" (ADD). The Board concluded that Dr. Woodfield's handling of this patient failed to meet the community

standard of care, in violation of I.C. § 54–1814(7), and was an abuse or exploitation of the patient, in violation of I.C. § 54–1814(22).

The Board made no specific findings regarding the doctor's credibility, while the hearing officer did. The hearing officer found that the testimony of the patient and her husband as to the charged conduct to be more credible than the testimony of the doctor. This assessment was based upon documentary evidence relating to the events, as well as upon the detail described by the patient and her husband.

The hearing officer found that Dr. Woodfield "did not violate the standard of care in the delivery of medical services to Patient." The Board rejected this finding in deciding that "Dr. Woodfield's handling of this patient failed to meet the community standard of care and was an abuse or exploitation of the patient." By lumping all of the conduct together in its findings without specifying any separate acts in violation of only sub-section (7) of I.C. § 54–1814, or separate acts in violation of sub-section (22), the Board in effect concludes that all of the offending conduct it described violated both subsections of the statute.

In general, we believe that findings should specify the particular conduct in violation of each sub-section of the statute. A violation of sub-section (7) requires proof that the offending physician provided health care "which fails to meet the standard of health care provided by other qualified physicians in the same community ..." A violation of sub-section (22), however, requires no such proof and, in fact, the conduct proscribed under this sub-section may have little, if anything, to do with "the provision of health care" to a patient.

Here, we can readily say that all of the doctor's offending conduct, as described in the Board's own findings, constituted "an abuse or exploitation of the patient arising out of the trust and confidence placed in the physician by the patient." I.C. § 54–1814(22). The evidence was undisputed that the requisite doctor-patient relationship existed at the time of these events and that the patient was being treated for physical and mental problems at the time the offending

conduct occurred. The doctor's offending conduct may have been so intertwined with his diagnosis and treatment of the patient's physical and mental problems that the exploitive or abusive conduct could not be separated from the "health care" he provided.

If based upon the evidence such a finding is made, then it would be easy to conclude that the conduct would also be in violation of sub-section (7), because no community's standard of care would or could tolerate professional health care that was delivered "packaged" with exploitive or abusive conduct of the patient. Nevertheless, it is up to the Board, not this Court, to make the necessary findings if the Board wishes to establish that Dr. Woodfield's conduct with this patient violated sub-section (7) as well as sub-section (22) of I.C. § 54–1814.

Based on the evidence in the record, we uphold all of the Board's findings which include those of the hearing officer accepted by the Board, and we uphold the Board's ultimate finding and conclusion that Dr. Woodfield's conduct with this patient was an abuse or exploitation of the patient, in violation of I.C. § 54–1814(22). However, for reasons stated, we vacate the Board's conclusion that the same conduct was also a violation of sub-section (7) of the statute.

*Patient 11.* As to count 11, the Board found no violation of the community standard in the health care provided by Dr. Woodfield.

*Patient 12.* The Board found that Dr. Woodfield had breached the standard of care in this case by conducting a vaginal ultrasound which, by the patient's account, lasted for approximately two hours and by proceeding with an unnecessary laparotomy. Having previously determined in Section 3 *ante* that the Board's finding of an excessively long ultrasound was unsupported by the evidence, we need only review the appropriateness of the Board's conclusion with regard to the patient's unnecessary surgery.

In this case, Dr. Crouch did not act as a proctor but was consulted by the patient to take over her care following the surgery done by Dr. Woodfield in July of 1992. Dr. Crouch testified that, in his opinion, Dr.

Woodfield had done an appropriate workup. He testified that he did not see any problems with what was done surgically. He further testified that the standard of practice would require initial suppression of a physiologic cyst with birth control pills, however, he noted that this patient had refused such an option.

The patient testified that she had not refused to take birth control pills if they were going to suppress the ovary and dissolve the cyst, although she had stated emphatically that "she hated the pill." She testified that Dr. Woodfield told her that her cyst was not treatable with birth control pills because of its size and complexity; that Dr. Woodfield described her condition as potentially life threatening, if the cyst were to burst, and recommended immediate surgery as the only option.

Dr. Woodfield contradicted the patient's testimony. He testified that he told the patient the cyst was one of three things: a functional cyst originating from trauma to the ovary in January 1992, a benign ovarian tumor, or ovarian cancer. He said that the patient refused birth control pills and that in his judgment, due to the size and chronicity of the cyst, that it would be the wisest thing to deal with the cyst on a surgical basis and remove it intact.

Dr. McGowan's expert opinion was that the typical or standard approach would be to wait before doing surgery to see if the cyst resolved itself. However, under conditions where a patient had informed the physician that she did not want to take birth control pills, Dr. McGowan testified that the physician would then be entitled to consider an operative approach. Dr. McGowan also opined that with a cyst of 6–7 centimeters in size and of a complex nature, with symptomology progressing over a six-month period, a physician would be more inclined to perform a laparotomy over a laparoscopy.

Finally, Dr. Kindred testified that this patient did not require immediate surgery and that suppression of the cyst with birth control pills should have been attempted first. Dr. Kindred asserted that a diagnostic laparoscope was called for, suggesting that Dr. Woodfield's reliance on the ultrasound was misplaced. The standard of care set forth by Dr. Kindred was that a diagnostic laparoscope should have preceded the laparotomy. Dr. Kindred recognized that there may be situations where the information obtained by a physician from vaginal ultrasonic examination concerning the nature, size, and complexity of a cyst would allow the physician to prefer a laparotomy rather than a laparoscopy, however, he testified that Dr. Woodfield's records fail to disclose such necessary information to justify the laparotomy.

Thus, support for the Board's conclusion that Dr. Woodfield breached the standard of care by performing unnecessary surgery is founded on Dr. Kindred's expert testimony. Had Dr. Woodfield elected to evaluate the patient's cyst through a laparoscopy prior to surgery, no breach of the standard could be found. We hold that the Board's conclusion is supported by substantial albeit conflicting evidence. We affirm the decision of the Board in this regard.

## V.

## CONCLUSION

In summary, we concur with the district court in holding inadmissible the testimony of Dr. Sigurdson regarding Dr. Woodfield's experience with the laparoscope and his truthfulness. We therefore vacate the Board's finding that Dr. Woodfield lied about the length of the ultrasound performed on patient 10 and the ultimate finding of breach which was based on the credibility determination made by the Board in that case. We conclude that the Board is required to render a reasoned decision which includes findings based on facts in evidence to allow for meaningful review of the application of those facts to the law.

We affirm the Board's conclusion that there was a failure to meet the community standard of care in Dr. Woodfield's treatment of patients 1, 7 and 12. In respect to patients 2, 6 and 9, where the Board found multiple violations, we agree that the standard of care was breached but not on all of the grounds cited by the Board. As noted in the opinion, either the evidence is not suffi-

cient, the facts of the alleged offending conduct are not sufficiently stated or the community standard was not set forth in the Board's decision, requiring us to reverse or vacate the Board as to some of the grounds relied upon by the Board in finding a violation had occurred. However, as to patients 2, 4, 9, and 10, the Board is not precluded, on remand, from making additional findings and conclusions which are consistent with this opinion. As to patient 8, our reversal precludes the Board from finding that there was a violation of the standard of care.

As to patient 10, we affirm the Board's finding that Dr. Woodfield's conduct violated subsection (22) of I.C. § 54–1814. On remand, the Board is not precluded from showing that the same conduct also violated subsection (7) of the statute, although we note the apparent redundancy.

Finally, we uphold the district court's order remanding the case to the Board to reconsider its decision to revoke Dr. Woodfield's medical license in light of our decision in this opinion.

No costs or attorney fees are awarded in this appeal.

WALTERS, C.J., and PERRY, J., concur.