11 P.3d 34

Francis F. PAUL, M.D., License No.
M–6118, Petitioner–Appellant,

v.

BOARD OF PROFESSIONAL DISCI-
PLINE OF the IDAHO STATE BOARD
OF MEDICINE, Respondent.

Nos. 24385, 24386.

Supreme Court of Idaho,
Boise, December 1999 Term.

Sept. 8, 2000.

Cox, Ohman & Brandstetter, Chd., Idaho Falls, and Bates, Meckler, Bulger & Tilso, Chicago, IL, for appellant. Michael I. Leonard argued.

Uranga & Uranga, Boise, for respondent. Jean R. Uranga argued.

SCHROEDER, Justice.

Dr. Francis Paul (Dr. Paul), a neurosurgeon, lost his license to practice medicine as a result of proceedings before the Board of Professional Discipline of the Idaho State Board of Medicine. He appeals that decision.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

On October 6, 1995, the Idaho State Board of Medicine (the Board) filed a complaint against Dr. Paul, charging him with violating the Idaho Medical Practice Act, Idaho Code § 54–1814(7). The complaint alleged that Dr. Paul had provided substandard care to twelve patients in Idaho Falls. A hearing was conducted before a hearing panel. Neurosurgeons from Idaho Falls and from out of state testified. Dr. Paul represented himself on all counts, except count seven. An attorney represented him on count seven, concerning patient I.D.

The hearing panel found that Dr. Paul had provided substandard care to nine of the twelve patients and recommended to the Board that his license to practice medicine be suspended for a five-year period and that he be restricted to an office-type practice, performing only elective disc surgery. However, the Board revoked Dr. Paul's license completely, rejecting the sanction recommended by the hearing panel. The Board concluded that Dr. Paul's failure to acknowledge his errors demonstrated that he was not remediable to retraining.

Dr. Paul appealed the Board's decision to the district court which upheld the decision of the Board.

## II.

## THE BOARD' S FINDINGS WERE NOT SUPPORTED BY SUBSTANTIAL AND COMPETENT EVIDENCE WITH RESPECT TO SEVERAL PATIENTS.

### A. Standard of Review

When a medical doctor has been disciplined by the Board of Medicine, the standard of review for an appeal to this Court is found in I.C. § 67–5279. The Court reviews the agency record independently of the district court's decision. *First Interstate Bank of Idaho, N.A. v. West*, 107 Idaho 851, 852–53, 693 P.2d 1053, 1054–55 (1984). The Court defers to the agency's findings of fact unless those findings are clearly erroneous. *Ferguson v. Board of County Comm'rs for Ada County*, 110 Idaho 785, 788, 718 P.2d 1223, 1226 (1986). This Court may not substitute its judgment for that of the agency as to the weight of evidence presented in the record. I.C. § 67–5279(1); *Woodfield v. Board of Professional Discipline*, 127 Idaho 738, 744, 905 P.2d 1047, 1053 (Ct.App.1995).

The agency's findings must be affirmed unless the findings are not supported by substantial evidence on the record as a whole or the findings are arbitrary, capricious or an abuse of discretion. I.C. § 67–5279(3)(d)(e). Substantial evidence is more than a scintilla of proof, but less than a preponderance. *Boley v. State, Industrial Special Indemnity Fund*, 130 Idaho 278, 280, 939 P.2d 854, 856 (1997). It is relevant evidence that a reasonable mind might accept to support a conclusion. *Id.*

Where the agency's findings disagree with those of the hearing panel this Court will scrutinize the agency's findings of fact more critically. *Woodfield*, 127 Idaho at 746, 905 P.2d at 1055 (Ct.App.1995). As the Court of Appeals noted in *Woodfield*, there is

authority for courts to impose on the agency an obligation of reasoned decision making that includes a duty to explain why the agency differed from the administrative law judge. *Woodfield*, 127 Idaho at 746–47 n. 3, 905 P.2d at 1055–56 n. 3.

## B. Lack of Substantial and Competent Evidence

With respect to the majority of charges, substantial and competent evidence is present, such that a reasonable mind could find the facts as the Board did. However, there are five instances where the evidence in the record does not support the findings made by the Board.

### 1. Patient D.G.

■ This patient fell from scaffolding and was diagnosed with a fracture of T10. The Board found that Dr. Paul violated the community standard of care by the "significant and unexplained delays" between neurosurgical evaluations and by failing to perform internal stabilization surgery prior to the patient's transfer to the Craig facility.

Dr. Paul was on vacation during the time in question, and other neurosurgeons were on call to attend to patient D.G. Moreover, Dr. Paul was only the consulting physician on the case, and he had notified the attending physician's office of his vacation plans. There is no clarification in the record as to why the delays in seeing the patient constituted a violation of the standard of care. It appears that the Board considered the delay itself to be the violation. There is no evidence that it is a violation of the standard of care for a neurosurgeon to vacation when there are other physicians in place to provide the necessary treatment. With regard to the internal stabilization surgery, Dr. Henbest testified that the surgery was a "good idea." Dr. Carlton testified that it was of "questionable necessity." The Board accepted Dr. Carlton's testimony in every case where her testimony supported a finding of a violation of the standard of care, but in this instance the Board found Dr. Henbest's testimony to be more credible than that of Dr. Carlton. Regardless, Dr. Henbest's opinion that internal stabilization surgery was a "good idea"

does not rise to the level of establishing a violation of the community standard of care.

### 2. Patient E.S.

■ The Board found that Dr. Paul violated the community standard of care by failing to order a CT scan when the patient began to deteriorate and by failing to treat for vasospasm by placing the patient on Nimodipine. The hearing panel believed that the "more serious violation" was Dr. Paul's failure to treat the patient with Nimodipine. However, the record does not establish that such treatment for patient E.S. constituted the standard of care during the time frame in question. Dr. Marano testified that the use of Nimodipine to treat vasospasm was the standard of care before 1992. Dr. Collins testified that it was not the standard of care by 1992. If this were all the evidence before the Board, a reasonable mind could conclude that the use of Nimodipine was the standard of care before 1992. However, this was not the sum of evidence before the Board with regard to this particular patient. Both Dr. Carlton and Dr. Marano were asked to consult on this case, and neither doctor recommended the use of Nimodipine to treat the vasospasm. The fact that neither Dr. Marano nor Dr. Carlton recommended the use of Nimodipine for this patient indicates that this was not the expected course of action in this case, regardless of whether such treatment might be the standard of care in other instances. Considering the record as a whole, there is not substantial, competent evidence to support the finding that Dr. Paul's failure to administer Nimodipine in this particular case violated the standard of care.

### 3. Patient M.E.

■ Patient M.E. was diagnosed with a dislocation of C5–6. The Board found that Dr. Paul violated the standard of care by (1) improperly using a hard collar for immobilization, (2) improperly failing to timely use a halo apparatus, (3) failing to appropriately reduce the dislocation and (4) failing to use any internal stabilization device.

The Board had substantial, competent evidence for all of these findings except the

second, that Dr. Paul improperly failed to use a halo apparatus. The evidence amassed on this point came from the testimony of Drs. Marano, Henbest and Collins. Dr. Marano testified that halos are an appropriate method of treating the dislocation, but that "[i]t probably would have been better to actually reduce the subluxation [before placing the patient in a halo]." Dr. Henbest could not state that the use of the halo was outside the standard of care. He said, ". . . the patient was placed in a halo. And, you know, I'm not stating that that's way out of the standard of care." Dr. Collins testified that the use of the halo was appropriate.

As to the second finding, no doctor has affirmatively testified to a violation of the standard of care in the case of M.E. The evidence pointing to a violation of a standard of care is inconclusive, and there is contradictory medical testimony indicating that no violation occurred. There is a lack of substantial, competent evidence to support the finding of a violation of a standard of care as to the second finding.

### 4. Patient I.D.

■ The Board found that Dr. Paul violated the standard of care by (1) failing to immediately order, interpret and utilize a CT scan on September 21, 1994, (2) failing to place an intracranial pressure monitoring device, and (3) relying on the skin flap alone to monitor intracranial pressure. These findings were all supported by substantial and competent evidence. However, the Board's fourth finding—that the performance of lumbar punctures violated the standard of care—is not supported by substantial and competent evidence.

The Board's determination that lumbar punctures were inappropriate is particularly troubling because the Board's findings departed from those of the hearing panel. Where the Board departs from the recommendations of the hearing panel, this Court will scrutinize the agency's findings of fact more critically. *Woodfield*, 127 Idaho at 746, 905 P.2d at 1055 (Ct.App.1995).

The Board was of the opinion that a herniation syndrome, resulting from the lumbar

punctures, may have precipitated the patient's death. The Board relied on the testimony of Drs. Carlton and Henbest in reaching this conclusion; however, neither Dr. Carlton nor Dr. Henbest was able to conclude that the lumbar punctures had been detrimental in this particular patient. While Dr. Carlton and Dr. Henbest agreed that a herniation syndrome had occurred, neither could attribute its occurrence to the performance of lumbar punctures.

In concluding that the lumbar punctures were detrimental, the Board also relied on its own review of the September 21 CT scan and the patient's medical record. While the Board is entitled to rely on its own expertise in making findings of fact, this Court takes note of the fact that no member of the Board is a neurosurgeon or a radiologist, whereas the hearing panel had a neurosurgeon, Dr. Smith.

There is substantial and competent evidence to support the hearing panel's conclusion that the performance of lumbar punctures was not outside the standard of care. There is not substantial, competent evidence to support the Board's contrary conclusion.

### 5. Patient D.W.

■ The Board found that Dr. Paul violated the standard of care by (1) failing to adequately and accurately assess the X-ray studies taken postoperatively and (2) take corrective action to realign the vertebral bodies following the Harrington Rod procedure. There is substantial, competent evidence to support the latter of these charges; however, there is not substantial, competent evidence to support the finding that Dr. Paul fell below the standard of care in the failure to accurately assess the X-ray studies taken postoperatively.

Dr. Paul did not notice that the rods were overdistracted in viewing the X-rays; however, two other Idaho Falls doctors asked to consult on the case missed the diagnosis as well. A fourth doctor, Dr. J.B. Oldershaw, also missed the diagnosis. Dr. Henbest, the Boise neurosurgeon who eventually made the diagnosis, admitted that anyone could have missed it. Four doctors missed the diagno-

sis, and the diagnosing physician admitted that any well-trained physician could have missed it. There is no additional evidence in the record—apart from the acknowledgment of Dr. Paul's error itself—which leads to the conclusion that Dr. Paul's error fell below the standard of care provided by other members of the local medical community. There is not substantial and competent evidence to support the finding that Dr. Paul's mistake fell below the standard of care.

## III.

### THE HEARING PANEL DID NOT ERR IN DENYING THE MOTION TO STRIKE

#### DR. CARLTON'S TESTIMONY.

 Dr. Carlton was a primary witness in this case. She suffered a brain tumor and has died. Dr. Paul challenged the admissibility of Dr. Carlton's testimony on the basis that the brain tumor rendered her incompetent to testify as an expert on complicated medical matters. Two doctors who worked with Dr. Carlton and were acquainted with her performance as a neurosurgeon submitted affidavits that vouched for her competency and qualifications. The hearing panel was satisfied by the affidavit testimony and its own observations of her demeanor throughout the course of hearing that Dr. Carlton was competent to testify. The district court affirmed this decision. Aside from Dr. Paul's unsupported assertions that Dr. Carlton was incompetent to testify, there is no evidence which undermines the hearing panel's determination.

## IV.

### THE HEARING PANEL DID NOT ERR IN ALLOWING DR. HENBEST TO REVIEW INADMISSIBLE DOCUMENTS IN PREPARING HIS TESTIMONY.

 Dr. Paul argues that the hearing panel denied him due process by allowing Dr. Henbest to review inadmissible documents before testifying. In response to this argument, the Court notes that the documents had not been deemed inadmissible at the time they were provided to Dr. Henbest. The prehearing order which prohibited the introduction of materials from the peer-review proceedings was issued after these materials had been provided to Dr. Henbest.

Dr. Paul's primary due process complaint is that he was unable to prepare an adequate defense because he was not informed which materials were provided to Dr. Henbest. However, Dr. Paul was representing himself on the majority of the charges. He had the right to depose Dr. Henbest or utilize other means of discovery to determine what Dr. Henbest would rely upon in forming his opinion. The attorney who represented Dr. Paul concerning patient I.D. did depose Dr. Henbest. The same opportunity existed for Dr. Paul. Moreover, Dr. Paul personally participated in all of the peer review proceedings that were available to Dr. Henbest, so it is not accurate to say that he was without the means to prepare an adequate defense.

## V.

### DR. PAUL DID NOT RECEIVE PROPER NOTICE OF A SCHEDULING ORDER EXCLUDING PREHEARING EVIDENCE BY AFFIDAVIT.

 Dr. Paul submitted the affidavit testimony of three out of state physicians in support of his treatment of patient I.D. and the fact that he was competent to practice neurosurgery. The hearing panel did not consider this testimony, since the prehearing scheduling order prohibited proof in affidavit form. Dr. Paul contends that the hearing panel denied him due process by preventing him from submitting testimony in affidavit form. He notes that the hearing panel did consider affidavit testimony in determining whether Dr. Carlton's testimony should be stricken.

 Procedural due process requires that a party be provided with an opportunity to be heard at a meaningful time and in a meaningful manner. *Matter of Wilson,* 128 Idaho 161, 167, 911 P.2d 754, 760 (1996). "[D]ue process is not a concept rigidly applied to every adversarial confrontation, but instead is a flexible concept calling for such

procedural protections as are warranted by the situation." *Id.* In this case Dr. Paul's procedural due process rights were violated to the extent that he was not provided with an opportunity to be heard at a meaningful time and in a meaningful manner. This deprivation resulted from a lack of actual notice to Dr. Paul regarding both the prehearing scheduling conference and the results of that conference which were memorialized in a prehearing scheduling order. Dr. Paul was representing himself on all but one patient. He was entitled to notice of the scheduling conference and had a right to participate in that conference. He was not served with notice and did not participate in the scheduling conference. Similarly, he was entitled to be served with a copy of the scheduling order. He was not served with that order.

With regard to the notice of the prehearing scheduling conference itself, there is some confusion. The prehearing scheduling order is dated March 3, 1996, and the certificate of service is also dated March 3, 1996; however, the body of the order indicates that the telephone conference during which the determinations were made occurred April 2, 1996. This cannot be. The scheduling conference had to precede the scheduling order; thus, only one date can be correct. If the date in the body of the order is correct, Dr. Paul had one month to make arrangements for non-affidavit testimony, rather than the two months the record indicates. This assumes that Dr. Paul actually had notice of the results of the scheduling conference, which so far as this record shows, he did not.

As noted, there is no indication that Dr. Paul received a copy of the scheduling order or was otherwise notified that testimony by affidavit would be prohibited. Since Dr. Paul was represented by counsel as to patient I.D. and his counsel was present at the prehearing conference, the hearing panel could properly exclude any information in affidavit form as to patient I.D. To the extent the affidavits concerned issues other than patient I.D., the hearing panel could not rely on the scheduling order to exclude the affidavits because Dr. Paul did not receive notice of the scheduling hearing or scheduling order.

## VI.

## CONCLUSION

The majority of the Board's findings are supported by substantial, competent evidence. However, as outlined in this opinion, some are not. The case is remanded to the Board to consider the proper sanction to be imposed, excluding those findings of the Board not supported by substantial, competent evidence. The Board is also directed to consider the evidence offered by Dr. Paul in affidavit form, except as that information concerns patient I.D. This is a mixed result in that both parties have prevailed on significant issues. The parties will bear their own costs and attorney fees.

Chief Justice TROUT and Justices SILAK, WALTERS and KIDWELL concur.