51 P.3d 410

**James A. LAURINO, M.D., Plaintiff–Respondent,**

v.

**BOARD OF PROFESSIONAL DISCIPLINE OF the IDAHO STATE BOARD OF MEDICINE, Defendant–Appellant.**

No. 27131.

Supreme Court of Idaho, Boise, February 2002 Term.

July 16, 2002.

Rehearing Denied July 16, 2002.

Uranga & Uranga, Boise, for appellant. Jean R. Uranga argued.

Quane, Smith, Boise, for respondent. Terrence S. Jones argued.

WALTERS, Justice.

Substitute Opinion the Opinion Issued May 1, 2002 is Hereby Withdrawn.

This is an appeal by the Board of Professional Discipline of the Idaho State Board of Medicine from a decision of the district court that reversed the Board's order revoking James A. Laurino, M.D.'s license to practice medicine. We hold that the Board erred in revoking Dr. Laurino's license in light of the evidence presented at the inquiry concerning Dr. Laurino's treatment of nine patients. However, because we also hold that there is substantial, competent evidence supporting the Board's conclusion that Dr. Laurino failed to provide proper medical care with respect to two of the patients, we remand the case for a new determination by the Board as to an appropriate sanction that should be imposed.

## FACTS AND PROCEDURAL BACKGROUND

The Board of Medicine filed a complaint against Dr. Laurino in May of 1998, alleging that Dr. Laurino had provided substandard care in his treatment of nine patients, who were seen in his general practice in Grangeville, Idaho, during a six-month period. A hearing officer appointed by the Board heard evidence on the allegations on October 12, 1998, and subsequently issued an exhaustive decision recapping the testimony and including his findings of fact, conclusions of law and a recommendation.

The hearing officer found only two minor violations of the standard of care with regard to Dr. Laurino's care and treatment of patient M.J. The hearing officer deferred to the Board for a determination of appropriate disciplinary action for the violations but otherwise recommended dismissal of all of the allegations in the remaining counts.

The Board independently reviewed the decision of the hearing officer and his recommended dismissal of the complaint, pursuant

to I.C. § 67–5244. On November 5, 1999, the Board issued its findings of fact, conclusions of law and final order. The Board found by clear and convincing evidence on each count that Doctor Laurino's management of his patient's care "did not meet the standard of care taken by other qualified physicians in the Grangeville community, taking into account Doctor Laurino's training, experience and the degree of expertise with which he holds himself out to the public." The Board concluded to take "its experience, technical competence and specialized knowledge in evaluating the evidence, as well as the extensive expert testimony by local physicians in determining that Dr. Laurino's conduct does not meet the standard of care." Finally, the Board determined that revocation of Dr. Laurino's license was the appropriate sanction to administer in the case.

After the Board denied Dr. Laurino's reconsideration request, Dr. Laurino filed a petition with the district court for judicial review. The memorandum decision of the district court reversed the decision of the Board and directed that the disciplinary complaint against Dr. Laurino be dismissed. The district court held that none of the Board's factual findings were supported by any reasonable interpretation of the evidence, that the Board ignored the testimony of witnesses presented by Dr. Laurino, and that the Board concluded that Dr. Laurino had altered or falsified records even though such charges were not a part of the complaint. The Board appealed from the decision of the district court.

### STANDARD OF REVIEW

■ The Idaho Administrative Procedure Act, Idaho Code § 67–5279, sets forth the standard of review for an appeal from a disciplinary proceeding by the Board of Medicine. In an appeal from the district court's decision where the district court was acting in its appellate capacity in a review under the APA, the Court reviews the agency record independently of the district court's decision. *Levin v. Idaho State Board of Medicine,* 133 Idaho 413, 987 P.2d 1028 (1999); *First Interstate Bank of Idaho, N.A. v. West,* 107 Idaho 851, 693 P.2d 1053 (1984). The rulings of the

district court therefore are not the focus of our review. The Court will defer to the agency's findings of fact unless those findings are clearly erroneous. *Paul v. Board of Professional Discipline,* 134 Idaho 838, 11 P.3d 34 (2000), citing *Ferguson v. Board of County Commissioners for Ada County,* 110 Idaho 785, 718 P.2d 1223 (1986). Neither the district court nor this Court on appeal may substitute its judgment for that of the agency as to the weight of the evidence presented in the record. I.C. § 67–5279(1); *Levin, supra* at 417, 987 P.2d at 1032; *Woodfield v. Board of Professional Discipline,* 127 Idaho 738, 905 P.2d 1047 (Ct.App.1995). The agency's findings must be affirmed unless the findings are not supported by substantial evidence on the record as a whole, I.C. § 67–5729(3), or the findings are arbitrary, capricious, or an abuse of discretion, I.C. § 67–5729(2)(d). Any findings made by the Board based on matters outside the record must be reversed as unsupported by substantial, competent evidence or as arbitrary and capricious.

### I.

### ESTABLISHING THE STANDARD OF CARE

■ The Medical Practices Act provides that a physician is subject to discipline by the Board for "the provision of health care which fails to meet the standard of health care provided by other qualified physicians in the same community or similar communities, taking into account his training, experience and the degree of expertise to which he holds himself out to the public." I.C. § 54–1814(7). The language of I.C. § 54–1814(7) has been held to be similar to the well-accepted definition of medical malpractice, contained in I.C. § 6–1012, and sufficient to notify medical practitioners that they could be disciplined for failure to conform to community standards. *Krueger v. Board of Professional Discipline,* 122 Idaho 577, 836 P.2d 523 (1992); *Woodfield v. Board of Professional Discipline,* 127 Idaho 738, 748, 905 P.2d 1047, 1057 (Ct.App.1995). The burden of proof in a disciplinary proceeding is the "clear and convincing" standard. *Cooper v. Board of*

*Professional Discipline,* 134 Idaho 449, n. 3, 4 P.3d 561 n. 3 (2000).

The Board contends that the hearing officer measured the conduct of Dr. Laurino against an incorrect standard of care derived from a misreading of *Krueger v. Professional Discipline,* 122 Idaho 577, 836 P.2d 523 (1992). Because of the application of the erroneous standard, the Board asserts it was justified in rejecting all of the hearing officer's findings and conclusions. The Board determined the standards of care in this case, relying principally upon the testimony of its experts: Dr. Hollopeter, who had practiced for twenty-five years in Grangeville, and Dr. Gardner, another Grangeville family care practitioner. Both doctors were on staff at the local hospital, Syringa Hospital, and were directly involved in peer review proceedings during which they observed and evaluated Dr. Laurino's performance and ultimately decided not to grant hospital privileges to Dr. Laurino.

In *Krueger,* the Court held that the district court's reliance on the "consensus of expert opinion" language[1] was misplaced. *Krueger, supra* at 581, 836 P.2d at 527. The Court reversed the district court's finding that the Board's decision as to patients A though E would be unconstitutionally vague without a finding that the decision was supported by a consensus of expert opinion. *Id.* at 582, 836 P.2d at 528. As the Court explained in a later case, the *Krueger* Court upheld "the application of a statutory standard [I.C. § 54–1814(7)] based on expert testimony of other physicians." *See Rincover v. State,* 124 Idaho 920, 923, 866 P.2d 177, 180 (1993).

■■■ A determination of a violation of the standard of care must be supported by expert testimony establishing the community's generally accepted standard of care required of the physician under the circumstances of each case under scrutiny. *Woodfield v. Board of Professional Discipline, supra.* To the extent that the evi-

dence as to the local standard of care is in conflict, that is a question of the weight, not the admissibility of the evidence. *Kozlowski v. Rush,* 121 Idaho 825, 828 P.2d 854 (1992) (Bistline, J., specially concurring). The weight to be given such expert opinion testimony depends upon the propriety and reasonableness of the testimony, but the testimony is not binding upon an experienced and professional board. *See Snyder v. State,* 18 Ohio App.3d 47, 480 N.E.2d 496, 498 (1984). The Board's finding of a breach of the standard of care then may be based on a comparison of the alleged violation against a well-recognized standard, articulated by the Board, based on the expertise and experience of the member physicians. *Woodfield,* 127 Idaho at 749, 905 P.2d at 1058. *See also* I.C. § 67–5251(5). The Board, however, may not use its expertise as a substitute for evidence in the record, since the requirement for administrative decisions based on substantial evidence and reasoned findings[2]— which provide the basis for effective judicial review—would become meaningless if material facts known to or relied upon by the agency did not appear in the record.

## II.

## SUBSTANTIAL AND COMPETENT EVIDENCE

■■■ The violations that the Board found against Dr. Laurino must be reviewed to determine whether the evidence in the record as a whole supports the findings, inferences, and conclusions made by the Board. I.C. § 67–5279(3)(d). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate and reasonable to support a conclusion. *Idaho State Ins. Fund v. Hunnicutt,* 110 Idaho 257, 260, 715 P.2d 927, 930 (1985).

In reaching a decision on the sufficiency of the evidence, we also consider the arguments raised by the Board concerning (1) the rebut-

---

**1.** The consensus language was enunciated in *Tuma v. Board of Nursing,* 100 Idaho 74, 593 P.2d 711 (1979), where the Court was addressing the authority conferred upon a board to promulgate rules and regulations defining unprofession-

al conduct, quoting the "consensus" language from *Reyburn v. Minnesota State Board of Optometry,* 247 Minn. 520, 78 N.W.2d 351 (1956).

**2.** *See* I.C. § 67–5248.

tal testimony presented by the Board's witnesses and (2) the testimony of Dr. Klomp, which had been ruled inadmissible by the hearing officer but held admissible by the district court.

■ Rebuttal evidence is "evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party." BLACK'S LAW DICTIONARY (6th ed.) p. 1267. Introduced to impeach Dr. Laurino's credibility, the testimony of Nurse Messenger, patient K.B. and Nancy Kerr could be properly considered rebuttal evidence. This testimony raised factual issues as to whether Dr. Laurino had falsified records—a question that was within the discretion of the hearing officer to resolve and did not require the expertise of the Board. However, because the Board found the rebuttal witnesses credible, the Board was required to state its reasons for disagreeing with the determination of the hearing officer.[3] We will duly examine the Board's findings hereinafter on each count where rebuttal evidence was presented.

■ Dr. Klomp, an obstetrics and gynecology specialist practicing in Boise, admitted that he did not inquire of a local physician in the Grangeville area to determine the local community standard. He testified, however, that Dr. Laurino's care of patients R.C. and K.B. was within the standard of care applicable in Boise. Although compliance with the local standard of care insulates the doctor from medical discipline, pursuant to I.C. § 54–1814(7), evidence that the doctor followed a higher standard should not be barred. If there is a lower standard practiced locally, for example, in Grangeville, the evidence should at least be a mitigating factor for disciplinary sanction. We conclude that the testimony of Dr. Klomp concerning the standard of care in Boise was a matter that properly could be considered by the Board.

Next, we turn to the Board's findings on each of the nine counts.

### 1. Patient A.G.

■ The Board found that Dr. Laurino violated the standard of care by not ordering a chest x-ray, by not monitoring oxygen saturations, and by not ordering an EKG upon A.G.'s admission to the hospital. The Board also found a violation in the standard of care for Dr. Laurino not to have transported to the hospital the EKG done in his office earlier the same day, to be included in the hospital record. As to the latter violation, the failure to transport the office EKG to the hospital, it is not supported by substantial and competent evidence particularly in view of Dr. Young's undisputed testimony that there was no standard of care on the transport of office test results to the hospital.

■ The patient, a sixty-nine-year-old man with previously diagnosed congestive heart failure, was seen first in Dr. Laurino's office on August 29, 1996, and then admitted to the hospital. There was evidence that a chest x-ray and an EKG were taken in the office by Dr. Laurino's nurse Kashmitter. The x-ray was produced for the disciplinary hearing; both the nurse and the patient testified that it had been taken, although the office records contained no reference to any x-ray or billing therefor. In concluding that Dr. Laurino had violated the standard of care requiring a chest x-ray, the Board chose not to believe either the testimony of Dr. Laurino or nurse Kashmitter that an x-ray had been taken. Instead, because Dr. Gardner testified that the x-ray had not been produced at the earlier peer review proceedings, the Board discredited Dr. Laurino's testimony and concluded that Dr. Laurino was being untruthful and had fabricated the x-ray. There is insufficient evidence to support the Board's conclusion that Dr. Laurino fabricated the x-ray.

---

**3.** The Idaho Court of Appeals has stated:
Generally speaking, findings based on witness credibility depend critically on observation of the witness. Therefore, "the [hearing officer's] decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement with the [hearing officer.]" [Citations omitted.]
*Woodfield v. Board of Professional Discipline,* 127 Idaho 738, 746, 905 P.2d 1047, 1055 (Ct.App. 1995).

The Board found a violation of the standard of care based on the testimony of Dr. Gardner, Dr. Hollopeter, and Dr. Maier that Dr. Laurino should have monitored A.G.'s oxygen saturations. Although there was evidence from Dr. Rockwell, one of Dr. Laurino's witnesses who testified that oxygen saturations are not commonly done, and from A.G.'s cardiologist, who did not recommend that oxygen be administered or oxygen saturations be done, the Board's findings are supported by the evidence. Therefore, we affirm the violation found by the Board regarding Dr. Laurino's failure to monitor A.G.'s oxygen saturations even though there is evidence to the contrary.

### 2. Patient R.B.

This patient had had two prior heart attacks or myocardial infarctions (MI). He met Dr. Laurino at Syringa Hospital complaining of chest heaviness and shortness of breath. R.B. walked to Dr. Laurino's office near the hospital, where he was first examined and then was referred back to the hospital for additional tests. Dr. Laurino's office notes show that R.B.'s presenting symptoms resolved themselves and that the EKG done in Dr. Laurino's office failed to indicate any new abnormalities. The charge in the complaint alleged that Dr. Laurino "failed to follow routine evaluative procedures."

The Board found in this case that Dr. Laurino had violated the standard of care by not keeping R.B. in the hospital for at least six hours to monitor his heart condition. No evidence was presented, however, as to how much time is required for a patient with a cardiac history to be monitored before being discharged after his symptoms have been ameliorated and all tests results are negative for MI. Thus, the applicable standard of care was not proven, and Dr. Laurino cannot be held to be in violation of a standard that the experts failed to define.

The Board found that on R.B.'s admission to the hospital, it was also a violation of the standard of care for Doctor Laurino not to conduct serial EKGs and serial enzymes, and not to do a cardiac consult. As stated earlier, one EKG was done at Dr. Laurino's office and a second EKG was done at the hospital. The two EKGs did not satisfy Dr. Gardner, who testified that it was a violation of the standard of care not to conduct serial EKGs and serial enzymes. Dr. Gardner's opinion did not factor in the patient's decision to refuse further tests when the initial results were negative for another heart attack. Dr. Hollopeter's opinion, he testified, was based only on the hospital records,[4] which did not provide a complete picture of the care rendered by Dr. Laurino in R.B.'s case. The Board accepted this testimony to find Dr. Laurino in violation of the standard of care. This was so, even though Dr. Gardner impeached his own opinion when he testified that he does not always obtain a cardiac consult, though in this case he said that one was required. Most notably, the Board ignored evidence showing that the patient R.B. did not agree to a cardiac consult and refused an x-ray or any duplicative tests. We fail to see how Dr. Laurino could be held to have violated the standard of care when the patient's efforts limited the care Dr. Laurino was allowed to provide. There is, as the district court held, a lack of substantial evidence to support the finding of a violation of the standard of care with regard to the Board's findings on this count.

Although not pled in the complaint as a ground for disciplinary action, the Board found that Dr. Laurino had altered R.B.'s records, based on the testimony of nurse Messenger, a former employee of Dr. Laurino's. In making its finding, the Board undertook to assess the credibility of nurse Messenger, whose testimony (given telephonically) suggested that the handwritten information appearing on the office EKG of R.B. had been added only after the peer review proceedings and in fact did not contain the standard information found on all the EKGs done in Dr. Laurino's office. The Board rejected Dr. Laurino's explanation of the handwriting on the EKG—the office staff, which is generally responsible for putting the patient information into the machine, was not on duty when he brought R.B. to the office from the hospital on the morning of August

---

**4.** At the time of Dr. Hollopeter's deposition, A.G.'s office records were unavailable.

29, 1996. The charge of altering records, however, is not supported by the record.

### 3. Patient R.C.

█ Patient R.C. was twenty-two weeks pregnant and passing blood clots when she first saw Dr. Laurino in his office on February 7, 1996. Shortly thereafter, R.C. miscarried, and on February 26, 1996, she was seen in the hospital. Dr. Laurino diagnosed an incomplete abortion and performed a dilation and curettage (D & C) on R.C.

The Board found that Dr. Laurino violated the standard of care by failing to type and cross-match R.C. prior to the emergency D & C procedure. All of the testifying physicians indicated that the standard of care would require typing and cross-matching only if the patient were hemorrhaging. The evidence in the record, however, was insufficient to allow the Board to conclude that R.C. was hemorrhaging when the D & C was performed. Dr. Hollopeter's testimony, which formed the sole basis for the Board's decision, was not reasonable under the circumstances, particularly because Dr. Hollopeter was present as a proctor at the D & C and would have been within his authority to stop the procedure pending receipt of the type and cross-match of R.C.'s blood, had it been required. The Board was also critical of Doctor Laurino's failure to do a history and physical on R.C. prior to the procedure. This finding is unjustified in that there is a history and physical in the record, which is dated April 19, 1996, although it was not coincident with the D & C and Dr. Laurino testified that he had done the history and physical earlier. No evidence was presented establishing a standard of care regarding the time within which a doctor must document his patient's files. The Board's findings on this count are not supported by substantial evidence in the record as a whole.

### 4. Patient V.D.

█ V.D., a forty-year old female with a prior hysterectomy, saw Dr. Laurino on July 29, 1996, with a complaint of rectal bleeding. Dr. Laurino obtained a urinalysis to rule out vaginal bleeding, examined the patient and scheduled a colonoscopy for August 2, 1996.

The results of the colonoscopy revealed hemorrhoids, which V.D. did not want removed. In order to find the cause of V.D.'s continuing complaints and to rule out a bleeding ulcer or tumors, Dr. Laurino ordered an upper gastrointestinal endoscopy (EGD), which he scheduled for August 21, 1996. The Board found that Dr. Laurino violated the community standard of care by failing to perform a physical exam of patient V.D. prior to the EGD.

The operative notes from the colonoscopy indicate that a rectal examination was performed in anticipation of the procedure that was done outpatient. There was evidence that the standard of care did not require a new history and physical for a second procedure within thirty days, as was the case with the EGD. There was also evidence presented that the standard of care did not require reports from outpatient procedures, such as colonoscopies and EGDs, to be included in the hospital records. At the time of Dr. Hollopeter's deposition, he had not been provided with the history and physical form that was later made a part of the record. Upon cross-examination, Dr. Gardner admitted that outpatient records did not need to be part of the hospital records to comply with the standard of care. The history and physical form itself was evidence of an exam, which could not be denied. The evidence, therefore, is insufficient to support the Board's finding that no physical exam of the patient had been conducted prior to the EGD procedure.

█ The Board found another violation of the standard of care in Dr. Laurino's failure to obtain pre-operative testing, including stools for O and P, fecal leukoctyes and enteric pathogens prior to doing the colonoscopy. Dr. Gardner testified that pathology specimens were obtained, which were negative for abnormalities or organisms. The only testimony stating the community standard of the care on this point came from Dr. Gardner, who said Dr. Laurino would have been required to perform an exam to determine what kind of testing would be needed. Additional testimony on this allegation was non-existent. Accordingly, the Board's finding related to pre-operative testing is not

supported by substantial evidence of a violation of the standard of care.

 In this case, there was also an issue of Dr. Laurino's truthfulness concerning the entry in his office records of July 31, 1996, which noted: "discuss colonoscopy with patient and an entry on a separate line that read 'See H & P form.'" The Board found that Dr. Laurino had falsified the history and physical form to make it appear that he had done an exam prior to the procedures. Because the form had not been presented in the earlier peer review proceedings and was not the standard form for Dr. Laurino's history and physical, the Board concluded the form was suspect notwithstanding that the information contained on the form was readily verifiable by the patient and very unlikely to have been made up. The Board's decision was founded upon the testimony of nurse Messenger who, without seeing the records in more than two years was able to recall that V.D. was not seen by Dr. Laurino in his office on July 31, 1996, and that the office notes formerly contained a "blank space" where the entry "See H & P form" now existed. The Board found nurse Messenger more credible than Dr. Laurino, rejecting the hearing officer's conclusion that the Board's witnesses failed to show that the exam did not take place. We agree with the district court's holding that the Board's view of nurse Messenger's testimony was unreasonable and that Dr. Laurino was improperly being disciplined for a charge as to which he did not receive notice.

### 5. Patient K.B.

K.B. saw Dr. Laurino three days after she delivered a seven-pound, four-ounce baby at home. She presented complaints of fever, body aches, heavy bleeding with clots and lower abdominal pains. Dr. Laurino testified, and his office notes confirm, that he conducted a physical exam, obtained a urinalysis from the patient, and prescribed antibiotics to combat the urinary tract infection (UTI) suggested by the results of the urinalysis. Dr. Laurino's notes also indicate a differential diagnosis of UTI or endometritis and that K.B. refused a pelvic exam.

Two days later, the patient appeared at the emergency room at Syringa Hospital, with abdominal pain and fever. She was attended by Dr. Gardner at the emergency room, who requested a catheterized urine sample, but K.B. refused this as well. The nurse's notes in the hospital record indicate that Dr. Laurino was called to the ER, but once again K.B. refused to allow a pelvic exam. Dr. Laurino concluded that K.B.'s appendix was involved, and he called Dr. Hollopeter to assist if an appendectomy was to be performed. K.B. agreed to submit to a pelvic exam when persuaded by Dr. Hollopeter that the only way to ascertain the need for an appendectomy was with a pelvic examination. Dr. Hollopeter discovered a tear in K.B.'s vaginal wall, and the proposed appendectomy was called off.

 The Board found that Dr. Laurino breached the standard of care by not conducting a pelvic exam on this patient, whom he advised would need an emergency appendectomy. There was no dispute in the testimony that the standard of care required a pelvic examination, but Dr. Hollopeter and Dr. Gardner, who were involved in treating this patient never commented about K.B.'s refusal to submit to a pelvic exam. The Board failed to take into account the patient's obstinacy in refusing not only the pelvic examination but also the fem catheterization, despite the expert testimony indicating that the patient's conduct should not lead to a violation of the standard of care by Dr. Laurino.

In this case, the Board again made a determination that Dr. Laurino was not truthful and concluded that he had falsified his records. The Board relied on the testimony of nurse Messenger, indicating that Dr. Laurino never had asked patient K.B. at her appointment in the office to disrobe and consent to a pelvic exam. Nurse Messenger asserted that the notation in the office records that patient refused a pelvic exam (which arguably was in different-colored ink) was not originally part of the record but added subsequent to the peer review proceedings. The Board also considered the testimony of the patient, K.B., but she could not recall whether she had refused the exam.

As previously stated, the Board maintained an unreasonable view of nurse Messenger's testimony and that of K.B., which was of no value whatsoever.

▇ Lastly with respect to patient, K.B., the Board found that Dr. Laurino should have recognized that the presence of Group A strep from the vaginal culture indicated endometritis. This finding ignores that from the start of his treatment of K.B., Dr. Laurino considered endometritis in his working diagnosis. According to two of the experts, Dr. Laurino's abdominal examination of K.B. showed no tenderness, which is usually present with endometritis, and was confirmed only after the lab results were returned. There is a lack of substantial evidence to support the Board's finding in this regard.

### 6. Patient M.J.

▇ When Dr. Laurino first examined M.J. at the hospital, he noted his impression as stroke. Given that M.J.'s symptoms subsided within one hour, Dr. Laurino changed his diagnosis to transient ischemic attack (TIA). M.J.'s case is the only one where the Board and the hearing officer agreed that Dr. Laurino had violated the standard of care. The hearing officer concluded that Dr. Laurino violated the standard of care by not requesting a neurological consult on this patient and because he did not document that he had performed an exam on the carotid arteries. The Board made its own findings rather than adopting those of the hearing officer.

The Board found that Doctor Laurino should have performed standard diagnostic tests on M.J., including a carotid duplex study, head CT scan and echocardiogram at the time of her admission to the hospital, even if it entailed transferring M.J. to another hospital or facility. Dr. Laurino testified that Grangeville has no CT scans, that carotid duplex studies are only done in Lewiston, and that he did schedule M.J. for a CT scan. None of the expert witnesses clearly identified the standard of care. Dr. Gardner testified that the standard of care was breached by failure to do carotid duplex study and echocardiogram and that the patient should have been transported for the tests; however-

er, he also testified that the echocardiogram and the CT scan could have waited until after discharge from the hospital, thus impeaching his own testimony. Dr. Young (one of Dr. Laurino's expert witnesses) testified that the treatment provided by Dr. Laurino was within the standard of care and that a CT scan could wait until later. Dr. Young asserted that an echocardiogram is not standard of care for an emerging TIA patient. Dr. Hollopeter's opinion was that Dr. Laurino breached the standard of care "by failing to manage the threat of stroke." Based upon our review of the record, we find no reliable, probative and substantial evidence to support the Board's finding.

▇ The Board found that Dr. Laurino should have charted the presence or absence of carotid bruits in M.J.'s case and should have consulted with a neurologist. Although there was evidence that failure to check for carotid bruits would be a breach of the standard of care, there was no standard testified to with respect to whether it was required that the findings of such an examination be written on the patient's record. Dr. Laurino testified that it was his custom not to write down negative findings, which should not be interpreted to mean that no examination had been done. From our review of the Board's findings, we conclude, as did the district court, that there was no real standard of care set forth regarding the documentation of negative findings.

▇ Another violation found by the Board in M.J.'s case was based on Dr. Gardner's testimony that Dr. Laurino's prescription of Lisinopril and Nifediprine for stroke was a breach of the standard of care because in stroke patients, the physician should not be trying to reduce but to maintain blood pressure and follow the patient's symptoms. The Board also referred to the 1996 Physicians' Desk Reference (PDR), which states that Zestoretic (the brand name of the meds M.J. was taking) is a fixed-dose combination drug, which is contraindicated for initial therapy. The Board ignored that Dr. Laurino was not treating M.J. for stroke, but for a TIA, and that he has a degree in pharmacology. Even though Dr. Laurino assessed

M.J.'s blood pressure readings as high, as supported by a Joint Committee study, there was no agreement as to whether a systolic reading of 144 or 140 constitutes a high reading. Dr. Laurino testified that in a patient such as M.J., it was important to monitor her blood pressure in that hypertension is a predisposer to TIA, which may presage a stroke. Because there was no clear standard of care regarding required medications for a patient with blood pressure readings such as M.J.'s, there was insufficient evidence upon which the Board could base its finding of a violation.

### 7. Patient C.F.

■ Patient C.F. is a sixty-five-year-old male, who came to Dr. Laurino's office complaining of flu and a terrible stomachache that had plagued him for the past year. The doctor's office notes reflect an abdominal exam and a history of a change in bowel movement to four to five times a day and cramping which was relieved with Advil. Dr. Laurino's original assessment included possible colitis, flu, and diarrhea. Dr. Laurino prescribed Amantadine and Flumadine, an antispasmodic to alleviate cramping. In a follow-up visit, C.F. reported that he was feeling better; the diarrhea had decreased; but he was still feeling weak. Over about three weeks' time, C.F.'s symptoms returned along with a weight loss of nine pounds from the month prior. On C.F.'s February 29, 1996, visit, Dr. Laurino made notes regarding his patient: "weak, anorexia, malaise, a pain in rectum that is intermittent but never gone and a loss of ten pounds." Dr. Laurino scheduled an abdominal ultrasound and a colonoscopy, which did not take place because C.F. was admitted to the hospital by Dr. Hollopeter on March 2, 1996, when a flex-sigmoidoscopy revealed that C.F. had colon cancer.

The Board found a violation of the standard of care in Dr. Laurino's failure to conduct a physical exam and a rectal exam on the January 22, 1996, initial visit. In support of this finding were the opinions of Dr. Gardner and Dr. Hollopeter that the community standard of care required a rectal exam of the patient, preferably on the first visit, con-

sidering the patient's age and long-standing symptoms. Dr. Gardner also testified that the standard of care required an abdominal exam on each subsequent appointment. The Board gave little weight to Dr. Laurino's explanation that an invasive rectal exam was not indicated for the flu symptoms, which resolved with medication, or for the stomachache with which C.F. had initially presented. We conclude that sufficient evidence exists to support the Board's finding that Dr. Laurino violated the standard of care in treating C.F.

■ The Board found a second violation in Dr. Laurino's prescription of Amantadine and Flumadine. Consistent with the expert opinions of Dr. Gardner and Dr. Rockwell, the Board determined that these drugs were of no therapeutic value in this case because the patient did not have respiratory symptoms. The fact that Dr. Laurino has a pharmacology degree did not sway the Board to Dr. Laurino's choice of prescriptions, nor did the fact that the patient's flu symptoms had resolved with the medication. From our review of the record, the non-therapeutic value of the drugs prescribed has not been established and thus cannot be the basis of a finding by the Board of a violation of standard of care. As to the Board's finding of a violation of the standard of care regarding a requirement that a nurse must witness the patient's signature on a consent form prepared by the doctor, there was no standard of care provided. Thus, these findings are not supported by substantial evidence.

### 8. Patient A.P.

■ The patient is a forty-seven-year-old man who was six weeks post angioplasty when he was seen by Dr. Laurino. On June 10, 1996, Dr. Laurino examined A.P. and ran tests, which showed no enzymatic changes and no EKG changes. Dr. Laurino diagnosed that A.P. was suffering from angina, not a heart attack; and when he reported being pain free, he was discharged. A.P. went to Syringa Hospital on June 17, 1996, complaining of sudden shortness of breath, dizziness and chest pain. He was admitted to rule out a heart attack. Dr. Laurino

ordered an EKG and cardiac enzymes, which results came back negative. A.P. became impatient in the hospital waiting for Dr. Laurino to return from his rounds and discharged himself.

The Board found that Dr. Laurino should have monitored A.P. for not less than six hours on June 10, 1996, after he was admitted to the hospital with lightheadedness and persistent shortness of breath. The Board does not explain how it determined that six hours is the benchmark, when all the patient's tests were normal and there were no signs of cardiac damage. There is not substantial evidence to support the Board's finding.

■ The Board also found that Dr. Laurino should have done a cardiac consult on both dates, considering the patient's significant cardiac history. The Board's finding does not take into account that the patient's EKGs were overread by Spokane Cardiology, which confirmed that A.P. was not suffering a heart attack. Neither the experts nor the Board with its expertise clearly stated the applicable standard of care, and the Board's finding of a violation, therefore, is not supported by the evidence

### 9. Patient H.M.

■ The patient had been treated by an orthopedic surgeon in Lewiston for a staph infection in the knee. Approximately one month later, he went to Dr. Laurino's office where the pain in his knee was diagnosed as bursitis and treated with antibiotics. On February 29, 1996, H.M. was again seen by Dr. Laurino, complaining of pain in both hips, fever and night sweats. Dr. Laurino's office records reflect a notation of hip sepsis. The hospital records of that date indicate that Dr. Laurino ordered a hep-lock to administer antibiotics and two blood cultures; his plan is listed as "will attempt to isolate infecting organism by blood cultures at peak of fever, then retreat with antibiotics." Dr. Laurino testified that H.M. refused to be hospitalized but agreed to intravenous antibiotics at the hospital, as prescribed by Dr. Laurino. Dr. Laurino testified that H.M. was self employed, wanted to stay working, and had financial concerns about being hospitalized.

The Board found that Doctor Laurino should have consulted with H.M.'s orthopedic surgeon. The Board also found that Dr. Laurino should have performed a physical exam and an x-ray on February 29, 1996. Finally, the Board found that Dr. Laurino's diagnosis of hip sepsis was an orthopedic condition requiring immediate treatment, and that he breached the standard of care in delaying treatment. However, the Board ignored the patient's testimony that he had refused a consult, a hip culture and an x-ray and that his condition improved under Dr. Laurino's care. The Board also ignored the patient's testimony that Dr. Laurino had examined him on every visit, even though there is nothing so indicated by the records. We agree with the district court on review of the Board's findings that the obstructive efforts of the patient, which in effect tied Dr. Laurino's hands, were given no mitigating force in the evaluation of whether Dr. Laurino met the standard of care in this case. The evidence on this count does not support the Board's findings.

### III.

### CONCLUSION

This Court has reviewed the record and concludes that the Board properly found two violations of the standard of care by Dr. Laurino. Substantial evidence exists in the record to support the Board's findings that Dr. Laurino should have administered oxygen and oxygen saturations in the case of patient A.G. and should have performed a rectal exam in the case of patient C.F.

Idaho Code § 67–5279(3) dictates that "[i]f the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings." The proper procedure, therefore, is for the Court in this instance to set aside the decision of the Board revoking Dr. Laurino's license and remand the matter to the Board with directions to determine a properly applicable sanction.

We conclude that the Board acted without a reasonable basis in fact or law, except with respect to two findings of a breach of the

**610**

standard of care by Dr. Laurino. However, because of the mixed results, we decline to grant Dr. Laurino's request for attorney fees on this appeal pursuant to I.C. § 12–117. Also, because of the mixed result, no costs are awarded on appeal.

Justices SCHROEDER, KIDWELL, EISMANN and Justice Pro Tem LANSING concur.